## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Jennifer M. Racz, M.D., | Court File No. _____ |
| Plaintiff, | |
| v. | **COMPLAINT** |
| Mayo Clinic, | |
| Defendant. | |

Jennifer M. Racz, M.D. ("Plaintiff"), for her complaint against Mayo Clinic ("Defendant"), states and alleges as follows:

### PARTIES

1. Plaintiff is a mother, a medical doctor, a breast-cancer surgeon, and a former employee and patient of Defendant. At all times relevant to this action, she was a resident of Minnesota.

2. Defendant is a Minnesota non-profit corporation; it employs hundreds of people throughout the state of Minnesota.

3. Defendant employed Plaintiff from August 2016 until December 31, 2019, including throughout her most recent pregnancy.

### NATURE OF ACTION

4. By this lawsuit, Plaintiff seeks to hold Defendant accountable for pregnancy discrimination, familial-status discrimination, and for retaliation. She asserts causes of action under: the FMLA [29 U.S.C. § 2615(a)(2)]; Title VII [42 U.S.C. § 2000e-2(a) (as

1

amended by the Pregnancy Discrimination Act of 1978) and 42 U.S.C. § 2000e-3(a)];

the MHRA (Minn. Stat. § 363A.08, subd.2, and § 363A.15); and, the MPLA (Minn.

Stat. § 181.941, subd.3). Additionally, she seeks to hold Defendant accountable for its

violation of the Minnesota Health Records Act (Minn. Stat. §§ 144.291 et. seq.), and for

committing an invasion of her privacy under Minnesota common law.

## JURISDICTION AND VENUE

5. This Court has original jurisdiction to hear Plaintiff's FMLA and Title VII claims

(28 U.S.C. § 1331), and it has supplemental jurisdiction over her related MHRA, MPLA,

Minnesota Health Records Act, and Minnesota common law claims [28 U.S.C. §

1367(a)]. Venue is proper because Defendant's unlawful acts arose in Olmstead County,

Minnesota (where it employed Plaintiff), and the parties were each residents of

Minnesota [28 U.S.C. § 1391(b)(1)].

## STATEMENT OF FACTS

6. In early 2016, Defendant recruited and hired Plaintiff as a Senior Associate

Consultant, to work in its Department of Surgery pursuant to a three-year contract.  She

commenced working in August 2016.

7. When it hired Plaintiff, Defendant expressed its intention and desire to retain her

well beyond three years, explaining that after her initial term of employment, she

would be eligible for promotion to a permanent Consultant position. Had Defendant

not expressed its desire to promote and retain Plaintiff beyond three years, she would

not have accepted the job nor relocated from Canada to Minnesota.

8. Defendant's Department of Surgery encompasses several smaller Divisions; each

Division is further separated into Sections. Plaintiff worked in the six-physician (five-Consultant) breast-cancer-surgery Section, a sub-part of the larger BEMGI Division, within the Department of Surgery.

9. A written protocol sets forth the steps Defendant was to follow with respect to Plaintiff's initial term of employment and her anticipated promotion to Consultant. This protocol listed specific criteria to assess her performance; it established timelines for regular appraisals of her work; and, it required Defendant to regularly provide Plaintiff feedback about her progress towards promotion.  Significantly, this protocol also stated that before Plaintiff's three-year work anniversary, all eleven members of the BEMGI Division were to meet, discuss and reach consensus about whether to promote her, extend her contract, or terminate her employment.

10. Upon information and belief, before and during Plaintiff's tenure, Defendant's Department of Surgery had not denied promotion to any third-year, Senior Associate Consultant, except those with a record of poor surgical outcomes, patient complaints, or misconduct.

11. Throughout her employment with Defendant, Plaintiff had no record of poor surgical outcomes, patient complaints, or incidents of misconduct.  As such, based on past precedent, Plaintiff objectively stood a near certain chance of promotion on or before the end of her initial three-year term.

12. During the first two years of her employment, Plaintiff had no reasons to suspect Defendant would not retain and promote her. She consistently received positive

feedback from peers and patients; and, she had no incidents of poor outcomes, no significant complaints about her work, nor any complaints of professional misconduct.

13. For example, in spring 2018, Defendant reviewed Plaintiff's performance in laudatory terms. She was, in their eyes, an exceptional provider – committed, hard-working, and collegial – or, as Defendant put it, a "true team player."

14. Until late July 2018, Defendant continued its positive assessments of Plaintiff and her performance. Then, nearly overnight and without any legitimate bases, Defendant's appraisals of Plaintiff changed.

15. Defendant's about-face appraisal of Plaintiff came hard on the heels of her announcing she was pregnant. On July 13, 2018, Plaintiff first shared her pregnancy in a one-on-one meeting with Dr. A.D., the head of Defendant's breast-cancer-surgery Section. As soon as Plaintiff told Dr. A.D. she was pregnant, Dr. A.D. warned her against taking maternity leave. She told Plaintiff that if she were to take a twelve-week leave for the birth of her child, it would hinder her chances of promotion, and cause other Consultants within their Section to question her work-ethic and value to the team. (Apparently, at Mayo, "true team players" do not take maternity leave).

16. Roughly two weeks later on July 26, 2018, Plaintiff revealed her pregnancy and her plans for maternity leave to the other members of her Section.

17. Dr. A.D.'s warning to Plaintiff about how other breast-cancer-surgery Section members would react to the news of her pregnancy and her expected leave proved to be spot-on.

18. Shortly after they first learned Plaintiff was pregnant and planned to take maternity leave, the five Consultants within her Section, including Dr. A.D., held a secret meeting to vote upon whether they should promote Plaintiff.

19. At this clandestine meeting, the two male surgeons voted to promote Plaintiff the following year. But all three older female Consultants, Dr. A.D., Dr. T.H., and Dr. J.B., voted against retaining and promoting Plaintiff. These three votes, cast by three older women, at a secret meeting about Plaintiff's future, shortly after she announced her pregnancy, and a full year before her initial term was up, were all it took to set in motion the end of Plaintiff's career with Defendant.

20. In mid-August, despite Dr. A.D.'s earlier attempts to intimidate and coerce her into foregoing her rights, Plaintiff confirmed that she would take a full twelve-week maternity leave as guaranteed to her by the FMLA and MPLA.

21. On August 20, 2018, shortly after Plaintiff had unequivocally invoked her right to use twelve (12) weeks of leave, Dr. A.D. told her that several of Defendant's plastic surgeons had complained about her collegiality and professionalism – a serious allegation for any doctor, let alone a younger surgeon up for promotion in less than twelve (12) months. Shocked and rightly concerned, Plaintiff asked Dr. A.D. to share with her the specifics of the plastic surgeons' accusations, but Dr. A.D. could not provide her any.

22. Out of concern for her career and wanting to address (and remedy) any issues her peers may have with her demeanor, Plaintiff immediately followed up with her plastic surgeon colleagues. These colleagues all responded with disbelief upon learning

5

about the allegations, and they each assured Plaintiff that they had no complaints about her collegiality or professionalism.

23. Plaintiff shared with Dr. A.D. what the plastic surgeons had told her – namely, that they had made no complaints about her professionalism or collegiality. Plaintiff also told Dr. A.D. that she feared these false allegations were intended to disparage and punish her because she was pregnant and planned to take maternity leave. Rather than address Plaintiff's concerns or disclose anymore about these fabricated allegations, Dr. A.D. sought to brush the matter under the rug, telling Plaintiff to "just let it go" and focus on her work.

24. On or about August 22, 2018, another female Consultant in Plaintiff's Section, Dr. J.B., interrogated a plastic surgeon about Plaintiff. According to this plastic surgeon, she asked him to recount whether he had ever observed Plaintiff commit any mistakes or could identify any deficiencies in her performance. Before learning of Plaintiff's pregnancy, Dr. J.B. had never taken it upon herself to interrogate colleagues about Plaintiff's performance, nor had she made it her job to seek derogatory information about any other member of the breast-cancer-surgery Section.

25. On August 27, 2018, Dr. J.J., the head of Plaintiff's BEMGI Division and a Consultant within the breast-cancer-surgery Section, confirmed that Dr. A.D. had misled Plaintiff.  At Plaintiff's request he had investigated the allegations, and he found that, in fact, there were no collegiality and professionalism complaints about Plaintiff.

26. Later that day, Dr. A.D. again sought to sow doubt about Plaintiff's suitability for promotion. She claimed that some of Plaintiff's colleagues had raised concerns about

Plaintiff's case volume, and she told her that she was not "pulling her weight." Not by chance, Dr. A.D. first raised these alleged performance issues only one month after she learned of Plaintiff's pregnancy. In fact, Plaintiff's performance or case volume had not decreased since announcing her pregnancy. The only difference in Plaintiff's performance was that Dr. A.D. had already determined, along with the other older female surgeons in their Section, to get rid of Plaintiff because of her pregnancy and her planned leave.

27. In that August 27th meeting, Dr. A.D. further belied her discriminatory intent by raising unfounded concerns that Plaintiff's productivity may decrease after the birth of her child. She specifically expressed doubt that Plaintiff would be able to meet her increased family obligations (a new baby) while still meeting the demands of her job at Mayo. Of course, Dr. A.D. had no idea whether Plaintiff would be able to succeed as a Consultant after the birth of her child; and, in fact, she had no intention of letting Plaintiff find out.

28. In early September 2018, disturbed by the sudden and unsubstantiated complaints about her work performance, Plaintiff met with Dr. G.T., the most senior Consultant in her Division, and with Dr. J.H., a member of the Officers and Councilors (a group of physicians designed to help peers who believed they were being treated unfairly or illegally in regard to employment decisions). At this meeting, Plaintiff shared with them examples of the disparate treatment she had suffered since announcing her pregnancy and her intent to take a full maternity leave.

29. At this meeting, Dr. G.T. reassured Plaintiff that he was unaware of any legitimate concerns about her performance, including the alleged deficiencies Plaintiff's Section members had raised with her (including *supra*). He also conveyed to Plaintiff that she would have no problem being promoted to Consultant in the next year. Dr. J.H. recognized that Plaintiff's colleagues were likely treating her unfairly because of her pregnancy. She further recounted for Plaintiff that such hostility by Defendant towards pregnant surgeons was nothing new: when she became pregnant several years prior, her Division Chair warned her that having children was a "threat to her career." Based on how Defendant had treated her during her own pregnancy, Dr. J.H. told Plaintiff to "expect the worst."

30. On September 11, 2018, Dr. J.J. provided Plaintiff an e-mail update on her performance and progress towards promotion. He praised Plaintiff in a number of areas, including in her surgical volume, case mix, confidence and independence, and her professionalism.

31. After sharing the good, Dr. J.J. then parroted the same unwarranted criticisms of Plaintiff that other Section members had raised immediately after she disclosed her pregnancy and her plan to take maternity leave:  a "perceived lack of passion for the high volume of clinical practice." And, "[I]t was not clear if [Plaintiff] would be able to be a consistent high volume [Mayo] surgeon, in terms of clinical productivity" moving forward.

32. At the conclusion of this email, Dr. J.J. essentially repeated the threat that Dr. A.D. had relayed to Plaintiff when she first disclosed her pregnancy: namely, that

Plaintiff "[needed] to be aware of the potential to… not be promoted to Consultant as [Plaintiff] considers [her] life choices."  Before learning Plaintiff was pregnant, Defendant had not raised any concerns about "her life choices."

33. On September 14, 2018, Plaintiff took her pregnancy discrimination concerns to Defendant's HR Department. She reported her fellow breast surgeons' acts of pregnancy discrimination and retaliation against her, including incidents described *supra* and the following: that in order to effectuate a discriminatory and retaliatory outcome, Consultants of her Section were flouting the protocol governing her promotion; the metrics they used to evaluate her performance appeared to be constantly shifting; and, they were intentionally and negatively misrepresenting her performance to others within the Department of Surgery.

34. On September 18, 2018, following Plaintiff's earlier request for assistance, Plaintiff met again with Dr. J.H. (Officer and Councilor and fellow Surgery Department member). She told Plaintiff that she had recently met with other Officers and Councilors regarding Plaintiff's concerns about promotion, and they specifically identified Plaintiff's decision to take twelve (12) weeks of maternity leave as an issue. That is to say, in their meeting, they acknowledged that Plaintiff's pregnancy and maternity leave were hurting her chances of promotion.

35. Rather than come to Plaintiff's defense by calling out her fellow Section members for violating the law, Dr. J.H. proposed that Plaintiff could solve her problem by not taking a twelve (12) weeks of leave, because historically Defendant's surgeons only took six (6) weeks off for the birth of a child. Alternatively, she suggested that Plaintiff might

9

take eight (8) weeks off, and then come back on a part-time basis for the remainder of her maternity leave. Of course, these suggestions were of no benefit to Plaintiff; they served only to legitimize Defendant's decision to hold her pregnancy and her pending FMLA/MPLA leave against her.

36. On October 12, 2018, Plaintiff met with Dr. J.J. regarding her performance. He stated that she had achieved important goals and improved in all metrics of her performance.

37. On November 13, 2018, just six weeks before her anticipated maternity leave, Plaintiff met with Dr. J.J. again to discuss her progress. He told her that her performance metrics still showed she was meeting important goals.

38. One week later, on November 19, 2018, Plaintiff went into pre-term labor, due to the stress and anxiety of enduring Defendant's discrimination and retaliation against her. Out of concern for her health and that of her unborn baby, Plaintiff's personal physician limited her to working no more than four hours per day.

39. Despite knowing that Plaintiff's health would be at risk, Defendant pressured her to work outside of her pregnancy-related restrictions; telling her it would supposedly boost her reputation as a hard worker. Plaintiff acceded to this pressure. According to Dr. J.J., the older surgeons in her Section were impressed by her decision to ignore the limits her doctor had set for her health. That is to say, they would rather have their pregnant colleague work more hours than to abide by her doctor's restrictions and deliver a healthy baby.

40. On or about November 28, 2018, a member of Defendant's Surgery Department told Plaintiff about the secret meeting in July 2018, convened by the older breast cancer surgeons in Plaintiff's Section. As described above, the Consultants in her Section had secretly met, this meeting occurred shortly after first learning she was pregnant, and, at the meeting, they voted not to promote her, with the three older women doctors all voting against her continued employment. This same surgeon told Plaintiff that their conduct towards Plaintiff since learning of her pregnancy was illegal and that she believed Plaintiff's performance merited promotion to Consultant.

41. On November 30, 2018, Dr.  A.D., once again without any factual basis, unfairly criticized Plaintiff's work ethic and the volume of her workload. She further told Plaintiff that she might not be happy or successful working for Defendant because of Plaintiff's "family needs and goals." Plaintiff was dismayed by the continuing unwarranted criticism of her work volume; especially because she had met her stated work-volume goals and she had often ignored her doctor's work restrictions to appease her colleagues' fabricated concerns about her work ethic.

42. On December 13, 2018, after weeks of working beyond her medical restrictions because Defendant urged her to ignore them, Plaintiff was forced onto short-term disability. Her personal doctor, also employed by Defendant, simply would not permit her to continue, especially in an environment like Defendant's Surgery Department, where putting oneself at risk was a sign of being a "team player." Still, the Consultants within in her Section persisted in assigning her more work; purportedly, to "reduce the burden" her pregnancy-related leave was placing upon them.

43. On January 21, 2019, Plaintiff gave birth to a healthy baby boy and commenced her long-planned (and much-maligned by Defendant) FMLA/MPLA maternity leave.

44. At or about the same time, her colleagues in the Breast Cancer Surgery Section began to search for a new surgeon, one who could presumably replace Plaintiff.

45. Plaintiff's FMLA/MPLA leave concluded on April 22, 2019. When she returned to work, Dr. J.J. told her that Defendant was delaying the decision about whether to promote her by twelve (12) weeks – the exact amount of time she had been on maternity leave. Defendant had no legitimate, non-discriminatory reasons to delay or deny Plaintiff's promotion to Consultant.

46. On April 26, 2019, and on May 7, 2019, Plaintiff again reported Defendant's discriminatory and retaliatory conduct against her to HR:  she described the ways in which Defendant, in particular the older breast cancer surgeons of her Section, had violated her rights to be free from pregnancy-related discrimination and retaliation, including as set forth *supra.*

47. On May 10, 2019, Plaintiff met with Dr. H.N., Chair of Defendant's Surgery Department. Dr. H.N. opened the meeting by telling Plaintiff, "it was no secret" that she "had made reports to HR" about the treatment she endured over the past ten or eleven months. Plaintiff proceeded to recount for Dr. H.N. the ways in which she had been mistreated by colleagues within her Section, including their failure to seek input from other members of her BEMGI Division about her job performance and her suitability for promotion. Dr. H.N. promised to look into Plaintiff's concerns about her pregnancy

discrimination in the promotional process. Dr. H.N. never followed through on her promise to Plaintiff.

48. On June 17, 2019, Dr. J.J. informed Plaintiff that Defendant would not promote her to Consultant and her appointment and career with Defendant would end on December 31, 2019. At this point, Defendant had conducted no investigation into her complaints of discrimination or retaliation. Nor had Defendant lifted a finger to address the flaws in the promotional process that Plaintiff had asked Defendant to investigate a month earlier.

49. In seeking to justify and legitimize its decision not to promote Plaintiff, Defendant knowingly cited false reasons for its decision. For example, Defendant claimed that Plaintiff's case volume was too low.  In fact, her case volume was on target for promotion: between 2017 and 2018, she increased her volume from 245 cases to 282 cases, despite having to work with pregnancy-related medical restrictions the final two months of 2018.

50.  Defendant's decision not to promote Plaintiff was the final step in a discriminatory process the older surgeons in her Section, especially three older women, had secretly agreed upon in late July 2018. As soon as Plaintiff informed Defendant she was expecting a new baby and would take her full twelve (12) weeks of maternity leave, the five Consultants within her Section were determined to not promote her (thus, eventually ending her career with Defendant) because of her pregnancy, her maternity leave, and her new child.

51. Defendant's own protocol dictated that all eleven Consultants in the BEMGI Division were to decide the fate of Plaintiff's career, not just five. When it notified Plaintiff she would not be promoted, Defendant knew she had complained about the discriminatory treatment she was suffering at the hands of the same five Consultants who decided to end her career at Defendant. Rather than intervene, as Plaintiff had requested (seeking help from HR, the Officers and Councilors, and the Chair of the Surgery Department), Defendant turned a blind eye to this discrimination and retaliation. Even more troubling, Defendant ultimately signed off on this discrimination and retaliation.

52. Shortly after she was notified she would not be promoted, Plaintiff suffered anxiety and depression caused by the discriminatory and retaliatory work environment created by Defendant. These disabling conditions prevented her from returning to Defendant's toxic workplace for approximately four months.

53. In November 2019, Plaintiff returned from disability leave. On December 31, 2019, Plaintiff's three-year appointment expired and she worked her last day for Defendant. But for Defendant's discrimination and retaliation against her, Plaintiff would have been promoted and she would currently be a Consultant in Defendant's breast-cancer-surgery Section.

54. On March 31, 2020, Plaintiff timely filed a charge of discrimination against Defendant with the EEOC and MDHR. On February 3, 2021, she voluntarily withdrew her charges of discrimination from the EEOC and MDHR. She has filed her claim within

ninety (90) days of her voluntary withdrawal of her charges. Therefore, her causes of action based on Title VII and the MHRA are timely and appropriate.

55. On October 2, 2020, Defendant notified Plaintiff that Defendant's Privacy Office became aware on August 5, 2020 that Plaintiff's medical records were accessed unlawfully by an employee of Defendant, Ahmad Sughayer, a male doctor and former colleague of Plaintiff in Defendant's surgery department.

56. Dr. Sughayer accessed medical records containing Plaintiff's private medical and mental health information, as well as numerous photographs of Plaintiff that were taken over the course of seven different visits between August 2016 and April 2020. The photographs at issue include images taken while she was fully or partially nude, pertaining to Plaintiff's obstetrical, gynecological and dermatological treatment.

57. Plaintiff did not authorize nor consent to the unlawful access of her medical records by Defendant's employee, Dr. Sughayer. Plaintiff also did not consent to Defendant's disclosure of her medical records to Dr. Sughayer. He had no legitimate reasons to access Plaintiff's medical records and Defendant had no legitimate reasons to disclose her medical records to him.

58. Dr. Sughayer was employed by Defendant in a capacity where his access (and corresponding non-consensual disclosure by Defendant) of medical records was foreseeable, a known hazard, of such employment; the access and disclosure of Plaintiff's medical records arose from the Dr. Sughayer's job duties; and it occurred in time and space related to his job duties.

15

59. The access and disclosure of Plaintiff's medical records was a result of Defendant's negligence or intentional conduct.

60. Because the medical records and photographs at issue are extremely private in nature, the breach of Plaintiff's privacy has caused Plaintiff to experience damages such as loss of privacy, embarrassment, harm to her reputation, pecuniary losses, emotional pain and anguish, loss of enjoyment of life and other emotional distress.

61. Additionally, even since Plaintiff's counsel has informed Defendant's counsel that Plaintiff would move forward with this Complaint, Mayo has continued to retaliate against Plaintiff. For example, in March, Dr. J.J. informed Plaintiff he was promoting himself to first author and demoting Plaintiff to second author on an academic paper Plaintiff researched and drafted during her time at Mayo. Dr. J.J. made this decision unilaterally and without consulting Plaintiff or any of the other authors whose names will be included on the paper. Plaintiff asserts Dr. J.J.'s work on that paper does not warrant his being named first author of the paper and that her name was removed as first author in retaliation for reporting her treatment to Mayo's HR Department, described *supra*, and continuing forward with this lawsuit.

## COUNT ONE
## FMLA DISCRIMINATION AND RETALIATION
### 29 U.S.C. § 2615(a)(2)

62. Plaintiff alleges each paragraph of the Complaint as if fully set forth herein.

63. On and after July 27, 2018, Plaintiff was an "eligible employee" within the meaning of the FMLA.

64. Plaintiff engaged in statutorily protected conduct by seeking and exercising her

rights to leave under the FMLA in connection with her own "serious health condition" and in connection with her pregnancy and the birth of her child.

65. Defendant unlawfully harassed, coerced, failed to promote and allowed Plaintiff's appointment to expire because she sought, invoked, and exercised her rights to leave under the FMLA. This harassment continued and increased after Plaintiff made reports to HR about Defendant's unlawful conduct, and Defendant knowingly failed to intervene on Plaintiff's behalf to remedy its violations of the FMLA.

66. Defendant did not harass, coerce, or fail to promote employees who were similarly situated to Plaintiff but who had not engaged in protected conduct under the FMLA.

67. If Plaintiff had not invoked her rights or sought to invoke her rights under the FMLA, Defendant would not have harassed, coerced, or failed to promote Plaintiff.

68. In addition to pecuniary damages, Plaintiff is entitled to her attorneys' fees and costs, along with liquidated damages, and reinstatement with promotion or front pay as provided for by the FMLA.

## COUNT TWO
### TITLE VII SEX (PREGNANCY) DISCRMINATION
### 42 U.S.C. § 2000e-2(a)

69. Plaintiff alleges each paragraph of the Complaint as if fully set forth herein.

70. Title VII, as amended by the Pregnancy Discrimination Act of 1978, forbids discrimination on the basis of sex and defines "sex" as including "pregnancy, childbirth or related medical conditions."

71. During the course of her employment, Defendant unlawfully discriminated

against Plaintiff because of her sex (her status as a pregnant woman).

72. Compared to employees who were not pregnant, Defendant subjected Plaintiff to disparate treatment with respect to continued employment, advancement opportunities, and other rights, privileges and conditions of employment, including subjecting her to harassment and failing to promote her before the expiration of her initial appointment.

73. The unlawful actions of Defendant against Plaintiff, including but not limited to those described *supra*, were part and parcel to a pattern and history of Defendant discriminating against employees who were pregnant, and such actions constituted discrimination in violation of Title VII.

74. As a direct and proximate result of Defendant's unlawful acts of sex (pregnancy) discrimination against her, Plaintiff has suffered and continues to suffer economic harm, lost earnings and benefits, embarrassment, damage to reputation, humiliation, emotional distress, and other compensatory damages in excess of $75,000.00.

75. In addition to compensatory damages, Plaintiff is entitled to her attorneys' fees and costs, and non-monetary remedies including reinstatement with promotion or front pay, as provided for by Title VII.

## COUNT THREE
## TITLE VII RETALIATION
## 42 U.S.C. § 2000e-3(a)

76. Plaintiff alleges each paragraph of the Complaint as if fully set forth herein.

77. During the course of her employment, Defendant unlawfully, knowingly, and intentionally retaliated against Plaintiff because she reported and opposed Defendant's

18

unlawful disparate treatment of her based upon her status as a pregnant woman.

78. Compared to employees who did not engage in such protected conduct, Defendant subjected Plaintiff to disparate treatment with respect to continued employment, advancement opportunities, and other rights, privileges and conditions of employment, including subjecting her to harassment and failing to promote her before the expiration of her initial appointment.

79. The actions of Defendant against Plaintiff, including but not limited to those described *supra*, constituted intentional "retaliation" within the meaning of Title VII; therefore, Defendant's actions were unfair employment practices for which Defendant is liable to Plaintiff.

80. As a direct and proximate result of Defendant's unlawful acts of retaliation against her, Plaintiff has suffered and continues to suffer economic harm, lost earnings and benefits, embarrassment, damage to reputation, humiliation, emotional distress, and other compensatory damages in excess of $75,000.00.

81. In addition to compensatory damages, Plaintiff is entitled to her attorneys' fees and costs, and non-monetary remedies including reinstatement with promotion or front pay, as provided for by Title VII.

## COUNT FOUR
## MHRA SEX (PREGNANCY) DISCRIMINATION
### Minn. Stat. § 363A.08, subd.2

82. Plaintiff alleges each paragraph of the Complaint as if fully set forth herein.

83. The term "sex" is defined by the MHRA as including, but not limited to "pregnancy, childbirth and disabilities related to pregnancy or childbirth."

84. During the course of her employment, Defendant unlawfully discriminated against Plaintiff because of her sex (her status as a pregnant woman).

85. Compared to employees who were not pregnant, Defendant subjected Plaintiff to disparate treatment with respect to continued employment, advancement opportunities, and other rights, privileges and conditions of employment, including subjecting her to harassment and failing to promote her before the expiration of her initial appointment.

86. The practices, policies, and actions of Defendant against Plaintiff, including but not limited to those described *supra*, constituted intentional sex (pregnancy) discrimination in violation of the MHRA.

87. As a direct and proximate result of Defendant's unlawful acts of sex (pregnancy) discrimination against her, Plaintiff has suffered and continues to suffer economic harm, lost earnings and benefits, embarrassment, damage to reputation, humiliation, emotional distress, and other compensatory damages.

88. In addition to compensatory damages, Plaintiff is entitled to her attorneys' fees and costs, a civil penalty, non-monetary remedies – including reinstatement with promotion, statutory punitive damages, and a doubling or tripling of her pecuniary damages, as provided for by the MHRA.

**COUNT FIVE**
**MHRA FAMILIAL STATUS DISCRIMINATION**
**MINN. STAT. § 363A.08, subd.2**

89. Plaintiff alleges each paragraph of the Complaint as if fully set forth herein.

90. The term "sex" is defined by the MHRA as including, but not limited to

"pregnancy, childbirth and disabilities related to pregnancy or childbirth."

91. The MHRA makes it an unfair employment practice for an employer "because of . . . familial status . . . to discharge an employee; or to discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment."

92. The MHRA defines "familial status" to include having an infant or child, and it further states "[t]he protection afforded against discrimination on the basis of family status apply to any person who is pregnant."

93. During the course of her employment, Defendant unlawfully discriminated against Plaintiff because of her familial status (her status as a pregnant woman and as a mother to one or more children).

94. Compared to employees who were not pregnant and did not have an infant to care for in their home, Defendant subjected Plaintiff to disparate treatment with respect to continued employment, advancement opportunities, and other rights, privileges and conditions of employment, including subjecting her to harassment, failing to promote her, and allowing her employment to expire.

95. The practices, policies, and actions of Defendant against Plaintiff, including but not limited to those described *supra*, constituted familial status discrimination in violation of the MHRA.

96. As a direct and proximate result of Defendant's unlawful acts of familial status discrimination against her, Plaintiff has suffered and continues to suffer economic harm, lost earnings and benefits, embarrassment, damage to reputation, humiliation,

emotional distress, and other compensatory damages.

97. In addition to compensatory damages, Plaintiff is entitled to her attorneys' fees and costs, a civil penalty, non-monetary remedies – including reinstatement, and statutory punitive damages, and a doubling or tripling of her pecuniary damages, as provided for by the MHRA.

**COUNT SIX**
**MHRA REPRISAL**
**MINN. STAT. § 363A.15**

98. Plaintiff alleges each paragraph of the Complaint as if fully set forth herein.

99. The MHRA makes it unlawful for an employer to intentionally engage in reprisal against an employee who opposes unlawful discrimination prohibited by the MHRA.

100. During the course of her employment, Defendant unlawfully, knowingly, and intentionally retaliated against Plaintiff because she reported and opposed Defendant's unlawful disparate treatment of her based upon her status as a pregnant woman.

101. Compared to employees who did not engage in such protected conduct, Defendant subjected Plaintiff to disparate treatment with respect to continued employment, advancement opportunities, and other rights, privileges and conditions of employment, including subjecting her to harassment and failing to promote her before her initial appointment expired.

102. The actions of Defendant against Plaintiff, including but not limited to those described *supra*, constituted intentional "reprisal" within the meaning of the MHRA; therefore, Defendant's actions were unfair employment practices for which Defendant is liable to Plaintiff.

103. As a direct and proximate result of Defendant's unlawful acts of familial status discrimination against her, Plaintiff has suffered and continues to suffer economic harm, lost earnings and benefits, embarrassment, damage to reputation, humiliation, emotional distress, and other compensatory damages.

104. In addition to compensatory damages, Plaintiff is entitled to her attorneys' fees and costs, recovery of a civil penalty, and other remedies – including reinstatement with promotion or front pay, statutory punitive damages, and a doubling or tripling of her pecuniary damages, as provided for by the MHRA.

### COUNT SEVEN
### MPLA RETRIBUTION/RETALIATION
### MINN. STAT. § 181.941, subd.3

105. Plaintiff alleges each paragraph of the Complaint as if fully set forth herein.

106. On and after July 27, 2018, Plaintiff was an "employee" within the meaning of the MPLA.

107. Plaintiff engaged in statutorily protected conduct by seeking and exercising her rights to leave under the MPLA in connection with her with her pregnancy and the birth of her child.

108. Defendant unlawfully retaliated against Plaintiff because she sought, invoked, and exercised her rights to leave under the MPLA. This retaliation continued and increased after Plaintiff reported and opposed Defendant's unlawful conduct, and Defendant knowingly failed to intervene on Plaintiff's behalf to remedy its violations of the MPLA.

109. Defendant did not retaliate against employees who were similarly situated to

Plaintiff, but who had not engaged in protected conduct under the MPLA. If Plaintiff had not invoked her rights or sought to invoke her rights under the MPLA, Defendant would not have retaliated against her.

110. As a direct and proximate result of Defendant's unlawful and willful retaliation against Plaintiff, she has suffered and continues to suffer economic harm, lost wages and benefits, and other pecuniary damages. Plaintiff is entitled to her attorneys' fees and other damages and remedies, as provided for by the MPLA.

**COUNT EIGHT**
**VIOLATION OF MINNESOTA HEALTH RECORDS ACT**
**MINN. STAT. § 144.298, subd. 2**

111. Plaintiff alleges each paragraph of the Complaint as if fully set forth herein.

112. The Minnesota Health Records Act provides that it is unlawful for a health care provider or other person to negligently release a health record without consent of the patient.  Defendant is a health care provider and Plaintiff's treatment records constitute a health record under the statute.

113. Defendant's conduct described herein constitutes a violation of the Minnesota Health Records Act, Minn. Stat. § 144.298, subd. 2, and Defendant is liable to Plaintiff for compensatory damages arising out of its negligent or intentional release of her health records without her consent.

114. As a result of Defendant's violation of the Minnesota Health Records Act, Plaintiff has been harmed; she has suffered and will continue to suffer loss of privacy, embarrassment, harm to her reputation, pecuniary losses, emotional pain and anguish,

loss of enjoyment of life, and other compensatory damages, all in an amount that exceeds $50,000.00.

## COUNT NINE
## INVASION OF PRIVACY

115. Plaintiff alleges each paragraph of the Complaint and fully set forth herein.

116. Defendants intentionally and/or negligently interfered, physically or otherwise, with the solitude, seclusion and private concerns or affairs of Plaintiff by unlawfully accessing, releasing and aiding and abetting the release of Plaintiff's private health records.

117. Plaintiff had a reasonable expectation of privacy with respect to her health records.

118. Defendants' conduct in disclosing Plaintiff's health records resulted in an intrusion upon her seclusion and invasion of privacy which occurred in a way that would be highly offensive to a reasonable person in Plaintiff's position.

119. As a result of this intrusion and invasion of privacy, Plaintiff suffered harm and is entitled to damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays for entry of judgment in her favor and an order providing that:

A. The practices of Defendant complained of herein are adjudged, decreed and declared to violate the rights secured to Plaintiff by the FMLA, Title VII, the MHRA, and the MPLA.

B. Defendant is mandated to adopt practices in conformity with the requirements of the FMLA, Title VII, the MHRA, and the MPLA.

C. Plaintiff is reinstated with promotion and back-pay, and awarded damages, including for emotional distress, harm to reputation, loss of employment opportunities, and mental anguish (as Defined by the MHRA).

D. Plaintiff is further awarded liquidated damages under the FMLA, statutory punitive damages under the MHRA, front-pay (if the Court determines reinstatement is not possible), and a doubling or tripling of her pecuniary losses under the MHRA.

E. Defendant shall pay the State of Minnesota a civil penalty, as provided for by the MHRA.

F. Defendant pays legal counsel for Plaintiff their reasonable attorneys' fees and pays Plaintiff the costs and expenses of this action.

G. That Plaintiff is awarded such other and further legal and equitable relief as may be found appropriate, just, or equitable.

**JOSEPH A. LARSON LAW FIRM, PLLC**

Date:  <u>April 30, 2021</u>                    <u>s/ Joseph A. Larson</u>
                                              Joseph A. Larson
                                              310 Fourth Ave. South, Suite 5010
                                              Minneapolis, MN 55415
                                              (612) 206-3704
                                              jlarson@joelarsonlaw.com

**MULLER & MULLER, PLLC**

<u>*s/ Andrew P. Muller*</u>
Andrew P. Muller
310 Fourth Ave. South, Suite 5010
Minneapolis, MN 55415
(612) 604-5341
apmuller@themullerlawfirm.com

**ATTORNEYS FOR PLAINTIFF**