UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Jennifer M. Racz, M.D.,                           File No. 21-cv-1132 (ECT/JFD)

　　　　　Plaintiff,

v.                                                **OPINION AND ORDER**

Mayo Clinic,

　　　　　Defendant.

---

Andrew P. Muller of Muller, Muller and Associates PLLC; and Joseph A. Larson of Joseph A. Larson Law Firm PLLC, for Plaintiff Jennifer M. Racz, M.D.

George R. Wood, Emily A. McNee, and Charles J. Urena of Littler Mendelson, PC, for Defendant Mayo Clinic.

---

　　　　Plaintiff Jennifer Racz is a surgeon who was employed by Defendant Mayo Clinic in a three-year Senior Associate Consultant appointment.  Racz became pregnant during this appointment and took medical and maternity leave.  Shortly after returning from leave, Racz was notified that Mayo would not be promoting her to Consultant, thus ending her employment at Mayo at the end of her term.  In this case, Racz alleges that Mayo engaged in discrimination and retaliation under the Family and Medical Leave Act ("FMLA"), retaliation under Title VII and the Minnesota Parenting Leave Act ("MPLA"), and reprisal under the Minnesota Human Rights Act ("MHRA").

　　　　Mayo seeks summary judgment.  Mayo's motion will be denied because (1) there is direct evidence that Mayo refused to promote Racz due to her exercise of FMLA and MPLA rights; and (2) Racz has identified evidence of pretext sufficient to demonstrate that

a reason prohibited under the FMLA, Title VII, and the MHRA likely motivated Mayo's decision not to promote her.

I[1]

*Mayo hired Racz as a Senior Associate Consultant in August 2016.* Mayo began recruiting and hiring a breast/melanoma surgeon in 2014. ECF No. 124 at 5. The breast/melanoma section was seeking a surgeon with experience with oncoplastic surgery, a type of breast surgery that removes breast cancer with a lumpectomy (rather than a mastectomy) while minimizing cosmetic detriment to the breast. *Id.* at 5–6. Racz applied for this position around 2014 or 2015 and went through a series of interviews. *Id.* at 5; ECF No. 127-1 at 7. Although Mayo offered Racz the position in 2015, ECF No. 128-6 at 2, her appointment was delayed until August 2016, ECF No. 127-1 at 8. Mayo ultimately employed Racz as a Senior Associate Consultant in Mayo's breast/melanoma section. ECF No. 124 at 4–6.

*The organizational structure of Mayo's breast/melanoma surgery section.* Mayo's breast/melanoma section consisted of five surgeons in 2016: Dr. Amy Degnim (head of the section), Dr. James Jakub, Dr. Tina Hieken, Dr. Judy Boughey, and Dr. David Farley. *Id.* at 1–2; ECF No. 153-12 at 4. The breast/melanoma section was part of a larger division within Mayo's Department of Surgery known as the Breast, Endocrine, Metabolic, and GI Surgery ("BEMGI") Division. ECF No. 124 at 1–2. The BEMGI Division was chaired by Jakub during Racz's appointment. ECF No. 124 at 1. Dr. Heidi Nelson chaired the overall

---

[1]      Unless otherwise noted, the facts are undisputed or described in a light most favorable to Racz. Fed. R. Civ. P. 56(a).

Department of Surgery during most of Racz's appointment, with Dr. Geoffrey Thompson taking over as interim chair in June 2019, for the last six months of Racz's time at Mayo. *Id.* at 2; ECF No. 127-1 at 56, 59. Nelson retired on June 15, 2019. ECF No. 127-1 at 56.

*Mayo's hiring and promotion process.* Mayo initially hires a new physician as a Senior Associate Consultant. ECF No. 124 at 2. A Senior Associate Consultant appointment is typically three years long and provides Mayo with an opportunity to evaluate the physician's performance and demeanor, while determining whether to promote the physician to a Consultant. *Id.* Mayo does not hire physicians directly as Consultants. *Id.* Mayo's written promotion policy directs each department to develop its own written promotion process. ECF No. 127-1 at 28. The Surgery Department developed a process which includes a list of general criteria to be considered and a basic timetable leading up to a promotion decision. *Id.* at 21. The timetable provides that at 30 months an assessment meeting will take place, and that "[p]rior to 36 months" the BEMGI Division Chair—at the time, Jakub—will "[m]eet with division members to discuss and reach consensus to support the decision to promote to Consultant, extend the SAC appointment, or terminate the appointment." *Id.*; ECF No. 152-1 at 1; ECF No. 124 at 2–3.

*Racz experienced challenges and received some negative feedback from her leadership throughout 2017.* On March 29, 2017, Jakub met with Racz to discuss her performance. ECF No. 124 at 7. As documented in a letter he provided to Racz, Jakub noted four areas of concern: "an insufficient level of cross-coverage by her, lower than expected operative volumes, a lack of confidence, and a poor working relationship with another established breast/melanoma surgeon, Dr. Tina Hieken." *Id.*; ECF No. 125-2 at 2–

3

3.  On May 11, 2017, Racz received a review in which she was rated a 3.54 out of 5 by

residents and fellows she worked with—the lowest rating of any physician for that period

in the division.  ECF No. 124 at 7; ECF No. 128-3 at 2–3.  Then, on November 29, 2017,

Jakub met with Racz again to discuss her failure to meet her clinical productivity target.

ECF No. 127-1 at 18.  Jakub summarized that meeting in an email sent the same day:

> A 1.0 breast surgical clinical FTE has a target of 360 cases a
> year or 30 cases a month. For 2017 we budgeted you 85% of
> the target and to date your [sic] approximately 20% below that
> 85% target.  The clinical metrics including planned cases and
> actual cases, per breast and melanoma surgeon, were
> transparently shared with you.  Your operative yield is 63%
> compared to an average of approximately 80% for the
> breast/melanoma Surgical Practice.

ECF No. 125-4 at 2.  Along with noting that Racz was failing to meet her already reduced

goal, Jakub told her in this same email that "2017 was a challenging year for you for a

number of reasons[,]" that he "would like to hit the reset button as we look forward to

2018[,]" and that "[i]t is understood that a surgeon in their 1st 1-2 years of practice will not

be able to meet the metrics of surgeons who are much more tenured."  *Id.*  Jakub noted that

Racz's "2018 metrics were bench marked lower than a 1.0 F TEE clinical breast surgeon

and we all agreed are very realistic."  *Id.*  In a post-meeting email to Nelson and Guidinger,

Jakub stated that after going over the metrics with Racz, they were on the "same page" and

that he was far more confident that she could be a good long term fit for their program.

ECF No. 152-1 at 4.  Nelson replied,

> Glad to be able to put the past behind us and start fresh.  Must
> have clarity about expectations and must have fulfillment of
> those expectations.  Never fun to have the a [sic] work
> relationship not work out long term so hopeful it will.

*Id.*

*Racz's first nipple-sparing mastectomy.*  "Surgeons in the breast/melanoma section are required to learn and become proficient at performing nipple-sparing mastectomies." ECF No. 124 at 4.  Racz performed her first nipple-sparing mastectomy in December 2017, 16 months after the start of her appointment.  *Id.* at 8.

*Racz falsely blamed her secretary for booking a non-refundable hotel room in Dubai.*  In January 2018, Racz emailed her secretary to book a room in Dubai "ASAP" for a medical conference that was occurring in February 2018.  ECF No. 121 at 1–2.  Her secretary had previously contacted her about booking for the trip in July 2017.  *Id.* at 1. Due to the last-minute booking, the purchase was non-refundable.  *Id.*  The next morning, Racz changed her mind and attempted to cancel her room but could not do so.  *Id.*  Racz contacted Nicole Rich, the supervisor of the medical secretaries in the division, attempted to blame her secretary for the situation, and denied telling her secretary to book the room "ASAP."  *Id.* at 1–2.  When Rich confronted Racz with email proof of her instructions, Racz simply replied with, "well, whatever anyway."  *Id.* at 2.  Jakub was notified of this situation.  ECF No. 121-1 at 3.

*Mayo conducted a "360 review" of Racz's performance in March 2018.*  Senior Associate Consultants typically undergo at least one 360 review during their appointment. ECF No. 124 at 8.  This review process provided Racz with a forum in which to receive feedback from her colleagues regarding (1) what she should start doing, (2) what she should stop doing, (3) what she should continue doing, and (4) any other comments of value to

her.  ECF No. 125-5.  Racz received both positive and negative feedback.  *See id.*  Her

positive comments included statements such as:

- Dr. Racz is a valuable member of our multidisciplinary team. She is a hard worker and always willing to go above and beyond to meet the needs of the patient and team.  She is approachable and respectful of all members of the team.  She is a true team player.
- Dr. Racz is fantastic.
- Again. Dr. Racz is an exceptional physician. She is very skilled and the patient's needs always come first. She is also always very kind to staff and appreciates and supports each individual person's role and responsibilities. She truly is a pleasure to work with!
- Dr. Racz should continue to speak at conferences.  She is an excellent speaker and is always well prepared.
- Dr. Racz is a pleasure to work with.  She is committed to her patients and supportive to the staff she works with.  Thanks for all your hard work!!

*Id.* at 4–5.  Her negative comments, which were largely constructive, included:

- Over reacting.  She seems overwhelmed at times.  She seems to lack confidence.  I don't think she gives herself 'enough credit.'
- Dr. Racz should start to communicate effectively with the multidisciplinary team.  At times she is quite [sic] and does not speak up.  I think she has a lot of excellent experience to share with the team.
- Dr. Racz should work on minimizing expressions of frustration during busy clinic days or when stressful events occur.
- I would encourage Dr. Racz to avoid pointed responses to staff in the operating room.
- It is sometimes difficult and inconvenient for patients when Dr. Racz's calendars get adjusted at last minute [sic].  Keeping calendars as consistent as possible would be much easier.

*Id.* at 2–3.

6

*Mayo conducted an annual review of Racz in April 2018.*  In a memo assessing Racz's performance, Jakub noted that Racz had "significantly improved her clinical volumes for the first quarter of 2018."  ECF No. 125-6.  He also noted that she had "done a yeomen's amount of work as super user[,]" and had "performed in a stellar fashion in this role and helped our division lead in the Epic transition." *Id.* at 3.  (According to the parties' representations at the hearing on this matter, an Epic "super user" is an individual in a section dedicated to working on the rollout of the Epic-brand software system.)  Jakub summarized, "Overall, I am impressed with her Q1 performance for 2018.  She has stepped up and significantly improved her clinical work productivity and has done an excellent job as super user." *Id.* at 4.  As part of this review, Racz did a self-assessment and noted that she needed to make more time for her family, while still being productive at work.  *Id.* at 3 ("I have had a difficult time balancing my career with family time and need to work on carving out more time for family while still being productive while at work.").

*In July 2018, Racz spoke with Dr. Degnim, the head of the breast/melanoma section, and was advised that taking twelve weeks of maternity leave would be detrimental to her promotion.*  Racz confided in Degnim that she was pregnant and that she wanted to take twelve weeks of maternity leave.  ECF No. 153-12 at 7.  Degnim "told [Racz] that it would be detrimental to [Racz] to take 12 weeks of [her] maternity leave given [her] upcoming promotion, and also that it may upset two of [her] colleagues because they would feel that they would have to take over the burden of [her] practice during that time." *Id.*  As Racz testified, Degnim "encouraged [her] not to take [her] full maternity leave at that time in order to bolster [her] chances of being promoted" and to try to gain support of her

colleagues. *Id.* Degnim was referring to Dr. Hieken and Dr. Boughey. *Id.* at 8. At Degnim's suggestion, Racz announced she was pregnant in mid-to-late-July 2018 at a section meeting. ECF No. 153-12 at 6. Jakub told Racz that she was "100% fully supported for 12 weeks maternity leave per institutional policy." ECF No. 124 at 9.

*Racz also spoke with another member of her section, Dr. Boughey, about her pregnancy and maternity leave.* ECF No. 153-12 at 8. Boughey "was concerned about the additional burden being placed on [Racz's] other colleagues and that that would not help . . . garner additional support of [her] colleagues, particularly Tina Hieken with regard to [her] promotion." ECF No. 153-12 at 8.

*Plastic Surgeons raised concerns about Racz's performance.* In August 2018, a plastic surgeon provided Jakub and Degnim with negative feedback regarding Racz's performance. ECF No. 125-8 at 2–3; ECF No. 124 at 9–10. Jakub investigated these concerns and notified Racz of his findings via email. ECF No. 125-8 at 2. He found that (1) there was a consensus among the three plastic surgeons he'd spoken with that there were no issues with Racz's professionalism; (2) Racz could improve her communication and documentation; (3) they had no technical concerns with the quality of Racz's work; (4) two of the three plastic surgeons were concerned with the complexity of cases Racz handled, as she was "less open to offering nipple sparing mastectomy and much more conservative in considering this option than the other breast surgeons[;]" and (5) there were no issues with her case sequencing. *Id.* Jakub noted that Racz appeared to be showing improvement with the complexity of cases she handled. *Id.*

*Racz contacted Mayo's Office of Staff Services regarding her concerns about taking maternity leave.*  The Office of Staff Services referred her to Dr. Heimbach, a female surgeon working in the Transplant Division, and member of Mayo's Resources and Referral Panel, who met with her in September 2018.  ECF No. 153-12 at 10; ECF No. 153-13 at 4–5.  Heimbach told Racz that female surgeons did not historically take twelve weeks of maternity leave, and that she had experienced similar treatment.  ECF No. 153-12 at 10.  And Racz stated that, in a later follow-up, Heimbach told her that "that the Officers and [Councilors] [did] not recommend that Racz take 12 weeks of [her] maternity leave and that instead [she] should only take six or eight weeks and then come back part-time" in order to bolster her chances of being promoted.  ECF No. 153-12 at 10.

*Jakub and the consultants met in September 2018 to discuss Racz's progress.*  Jakub emailed Racz with the subject line "SAC to Consultant," and described to her the results of their meeting.  ECF No. 125-9.  Jakub provided Racz with an overview of her strengths, weaknesses, demonstrated improvement, case numbers, and their remaining concerns.  *Id.* at 2–3.  Her strengths included her comfort with general surgery, her practice depth beyond breast cancer, that she had met her 2018 targets to date, her research accomplishments, her promptness and organization with clinical care, her role as an Epic super user, and that she had championed bringing the T-VEC cancer therapy program to Mayo Clinic Rochester.  *Id.* at 2.  In the "Weakness" section, he critiqued her first year—describing it as a "glorified super fellowship"—due to a need for more coaching and her issues with the volume of clinical practice.  *Id.*  He also criticized her "mutual respect issues" with others, and that she was not using her MBA.  *Id.*  Jakub stated that she had shown improvement in surgical

9

volume, case mix, confidence, independence, professionalism, and mutual respect with colleagues outside the department. *Id.* Further, she demonstrated a "[s]ignificant improvement in making late and frequent calendar changes that impact the clinic." *Id.* Still, "[t]he biggest concern among the breast surgeons [was] regarding a perceived lack of passion for the high volume clinical practice." *Id.* While he told Racz that the group gave her "a pass on the first year," he clarified that although Racz had improved her case volume, and had made some improvement in case mix, they were not yet convinced that she could keep up with the required volume. He told her, "[I]t is not clear if you will be able to be a consistent high volume Mayo Clinic Rochester surgeon, in terms of clinical productivity." *Id.* He notified her that her likelihood of moving from Senior Associate Consultant to Consultant was estimated at 50%. *Id.*

*Racz contacted and met with Steffany Guidinger, a Mayo Human Resources employee, in Fall 2018.* ECF No. 127-1 at 16. Racz discussed her conversations with her colleagues regarding whether she should take twelve weeks of maternity leave, her fear of non-promotion if she took maternity leave, that she was meeting her 2018 case targets, her perception that her targets had changed since announcing her pregnancy, and her conflict with Dr. Hieken. *Id.* Racz expressed to Guidinger "that [she] thought what [she] was being told was illegal, and that [she] was feeling significant pressure from [her] colleagues to not take [her] full maternity leave such that [she] could garner their support in the decisionmaking process for [her] promotion." *Id.* Guidinger told Racz that she would look into the issue and would schedule a follow-up meeting. *Id.* Racz did not meet with Guidinger again until after her maternity leave. *Id.*

*Racz met with Jakub on October 24, 2018.*  In an email to Racz sent the day of the meeting, Jakub provided an overview of their discussion.  ECF No. 125-7 at 2.  First, Jakub stated that although her operative volumes had increased, there was concern that it stemmed from increased volume of "lower acuity cases, such as muscle biopsies and excisional lymph node biopsies." *Id.*  He expressed a need for her to increase her volume of nipple-sparing mastectomy procedures. *Id.*  Second, he told her that she "should proceed with performing level 1 and 2 oncoplastic procedures, without plastic surgeon assistance." *Id.*  Third, they discussed maternity leave. *Id.*  He stated, "Maternity leave.  You and I discussed this approximately 6-8 weeks ago.  I stated then and reiterated today that you are 100% fully supported for 12 weeks maternity leave as per institutional policy." *Id.*

*Racz developed complications with her pregnancy and was placed on medical restrictions on November 19, 2018.*  ECF No. 127-1 at 12.  She was limited to working four hours per day. *Id.*  When her complications worsened in mid-December, she was placed on full restrictions. *Id.*  Per her doctor's instructions, Mayo placed Racz on medical leave until the birth on January 21, 2019. *See* ECF No. 152-3 at 1.  Racz then remained on leave until her return to work on April 22, 2019.  ECF No. 127-1 at 10, 12.  Despite her restrictions, missing the rough equivalent of one month of work, Racz completed 277 total cases in 2018, exceeding her annual target by 5 cases, ECF No. 152-2 at 5.

*Mayo was notified in January 2019 of a plastic surgeon's concerns about Racz's manipulation of patient records.*  While Racz was on leave, a plastic surgeon named Dr. Aparna Vijayasekaran notified Jakub of Racz's conduct during a late 2018 surgery.  ECF No. 123.  Vijayasekaran had met with the patient in a preoperative consultation. *Id.* at 1.

11

During the surgery, Racz asked Vijayasekaran to scrub in and provide recommendations. *Id.* She did, then left the theatre. *Id.* Later, Racz called Vijayasekaran back to the theatre, where she modified the oncoplastic closure of the breast to improve its appearance. *Id.* After completing the surgery, Vijayasekaran overheard Racz tell the operating room nurse to remove Vijayasekaran's name from the notes of the operation and not list her as participating in the procedure. *Id.* at 1–2. Racz then asked Vijayasekaran not to dictate notes of the procedure, bill for her services, or tell Jakub about her involvement in the surgery. *Id.* at 2. Vijayasekaran reported the incident to her mentor, who in turn reported it to the chair of the Plastic and Reconstructive Surgery Department, and to Jakub. *Id.* Racz disputed these claims. ECF No. 153-9 at 11. Jakub investigated the situation and questioned the nurse who was in the room, who could not verify or dispute either side's recollection of the situation. *Id.*

*Racz contacted Jakub during maternity leave.* On March 3, 2019, Racz emailed Jakub, requesting to scrub in on one nipple-sparing mastectomy case per week during her leave, as that is an area Jakub had identified to her as an area for needed improvement. ECF No. 125-10 at 2. Jakub approved this request, limiting Racz to one case per week, with up to four hours per day. *Id.*

*Racz returned from leave on April 22, 2019.* Three days later, on April 25, 2019, Jakub submitted Racz's annual performance review to the Chair of the Department of Surgery, Dr. Nelson. ECF No. 124-1 at 9. Unlike the annual review he conducted in 2018, which provided information about Racz's performance under the "Division Chair Summary" section, *see* ECF No. 125-6 at 3, this section in the 2019 review is empty, *see*

ECF No. 124-1 at 10.  Once again, however, Racz completed a self-assessment as part of this process, in which she stated that she wanted to grow her clinical practice, hone her technical skills with oncoplastic and nipple-sparing mastectomy procedures, work on team cohesiveness, and "[b]ecome more of a team player and contribute on an equal level to that of [her] colleagues to the best of [her] ability."  *Id.*  Jakub also notified Racz that her appointment would be extended by four to five months to account for her absence on medical leave.  ECF No. 153-9 at 8.  He extended her appointment "to give her the absolute benefit of the doubt and give her as many opportunities as she could to prove herself" and "have the highest chance to be successful."  *Id.*

*The day after Jakub submitted her performance review, and four days after returning from leave, Racz once again spoke with Steffany Guidinger.*  On April 26, 2019, Racz spoke with Guidinger over the phone.  ECF No. 153-5.  Per Guidinger's notes from the call, Racz reported her concerns that she had felt a change in her treatment in late Summer and early Fall 2018, that began shortly after announcing her pregnancy.  *Id.* at 1. Racz told Guidinger that she had requested to know the expectations of her but had not received the information in writing.  *Id.*  Further, she claimed that although she had met her 2018 targets, she was now told that she was not doing enough nipple-sparing mastectomies.  *Id.*  She also claimed that other surgeons told her not to take more than 6 weeks of leave.  *Id.* at 1, 4.  Two days later, Guidinger met with Racz and Dr. Trinidad, Racz's obstetrician.  ECF No. 152-2 at 7.  Trinidad told Guidinger that the breast surgeons had asked Racz to work beyond the pregnancy-related work restrictions that Trinidad had

imposed in 2018.  ECF No. 153-5 at 3.  Trinidad also recalled that she called Jakub and

told him "enough is enough."  *Id.*

    *Guidinger investigated Racz's complaints*.  On May 3, 2019, Kevin Hennessey, the

Administrator of the Department of Surgery, emailed Jakub requesting that he bring all

documentation he had regarding Racz's Senior Associate Consultant status to a May 9,

2019 meeting about Racz.  ECF No. 152-2 at 3–4.  Nelson and Guidinger were copied on

this email.  *Id.*  Jakub compiled a packet of information and distributed it to the group

before the meeting.  *Id.* at 3.  On May 7th, Guidinger emailed Jakub, Hennessey, and

Nelson follow-up questions after receiving the materials from Jakub.  *Id.* at 2–3.  She

informed them, "I will share that [Racz] has asked to meet with me (will be the 2nd time)

in a week and a half to discuss her concerns. Will provide an update at Thursday's meeting

as well."  *Id.* at 3.  The same day, Jakub replied to the email chain with apparent confusion

regarding the promotion decision process.  *Id.* at 2.  He wrote:

> It is interesting that I have not heard a singular method of
> determining SAC to consultant by prior division chairs I have
> spoken with. Personally I have seen vote bar in an email sent
> to the division members from the chair and hands raised votes
> at division meeting. In these situations it was never explained
> what was the purpose and scoring of the voting — was it to get
> a sense from the division chair, was it to make the definitive
> decision and what vote count directed the decision — could
> one individual blackball, was it a simple majority...?

*Id.*

    *Guidinger notified Jakub of the content of Racz's complaints.*  Guidinger met with

Jakub on May 15, 2019 to discuss Racz's concerns.  ECF No. 151-16 at 5.  She told Jakub

"that Dr. Racz had expressed concerns about her not being promoted at Mayo and concerns

about the work restrictions and work she was asked to do during those restrictions." *Id.*
On May 20, 2019, Jakub emailed Guidinger division-wide surgery statistics. ECF No. 152-
2 at 5. In the email, he stated, "[Y]ou can see Dr. Racz consistently is the lowest in the
division, per prior material, has the shortest operative hours and earliest close for the breast
surgeons AND the least complex cases. The newest member of the team here trying to
establish herself is typically the high performer not the low performer compared to all her
senior partners." *Id.* Racz's listed year-to-date case total was 11 as of April 2019, so her
2019 annualized total was listed as 33. *Id.* Racz had been on maternity leave for all but 8
days during that period. The statistics also listed her 2018 case total as 277, without noting
that she had missed roughly one month due to her pregnancy-related restrictions. *See id.*
Jakub forwarded this email to Nelson and Hennessey. *Id.* Guidinger then contacted Racz
on June 5, 2019—the apparent end of her investigation. ECF No. 153-16 at 4.

*Racz left a surgical clip inside of a patient during a May 2019 surgery.* ECF No.
127-1 at 18; ECF No. 119-1 at 2. She contacted Dr. Degnim to assist and advise her
regarding the appropriate response. ECF No. 119-1 at 2. In his deposition, Jakub stated
that he was aware of other surgeons losing track of a clip during surgery, it had happened
to him as well, and when deciding not to promote Racz, the incident "in isolation was not
an issue." ECF No. 162-1 at 1.

*Dr. Geoff Thompson, Nelson's eventual successor as the Chair of the Department
of Surgery, told Racz that he supported her promotion.* In February 2019, he told her that
her metrics looked good, and that he believed Jakub was in her corner. ECF No. 153-6 at
7. He also suggested Racz should voluntarily scrub in to observe nipple-sparing

mastectomy procedures while on maternity leave.  *Id.* at 6.  In April, he told her, "I want you to stay"; "I believe you are needed"; and "Many of us want you."  *Id.* at 4–5.  On May 21, he told her that the surgeons in the Endocrine Section of the BEMGI Division supported her.  *Id.* at 3.  When Racz expressed confusion regarding why her promotion had not been discussed at the division level, Thompson stated,

> I just don't know.  It doesn't seem right.  Unless there are things that they are not sharing with the other members of the division I feel you should be promoted and we have to figure out a waythat [sic] you can all learn to get along[.]

*Id.* at 2–3.

*Others in the BEMGI Division and throughout Mayo supported Racz's promotion.*
Dr. Melanie Lyden also wrote a letter of support, in which she stated, "Dr. Racz's practice has continued to grow by more than 10% each year and she is in acceptable range of her target when including medical and maternity leave."  ECF No. 153-8 at 1.  She further stated, "I am honored to have [Racz] as a colleague.  In my assessment, she meets Department of Surgery criteria for promotion to Consultant."  *Id.* at 2.  In addition, Drs. Manrique, McKenzie, Hill, Leone-Ferre, Corbin, and Martinez-Jorge all wrote letters in support of Racz in June 2019.  ECF No. 153-14 at 8–16.

*Dr. Jakub met with the breast/melanoma surgeons around May or June 2019 to discuss whether to promote Racz to Consultant.*  ECF No. 124 at 11–12.  At this meeting, they discussed their concerns with promoting her "because of issues with her operative surgical numbers, lack of progress and confidence in performing surgical procedures, and professionalism."  ECF No. 118 at 3.  An area of concern was her lack of competence in

performing nipple-sparing mastectomy procedures.  ECF No. 128-7 at 3; *see also* ECF No. 117.

*Mayo notified Racz that it was not advancing her to Consultant.*  ECF No. 127-1 at 10, 49.  On June 17, 2019, Mayo sent Racz a letter notifying her of its decision not to promote her and outlining its reasoning.  ECF No. 128-5.  The letter was signed by Jakub and Nelson.  *Id.*  It stated that Racz would not be promoted because she had failed to develop an oncoplastic practice, she still needed technical mentoring to complete procedures, she had low clinical operative volumes, her cases lacked complexity, and she had professionalism issues.  *Id.*  It is unclear precisely when the decision not to promote Racz was made.  Jakub testified that he did not remember when he made the decision not to promote Racz.  ECF No. 153-9 at 17.  Although the letter was dated June 17th, it was signed by Nelson who retired on June 15th.  ECF No. 127-1 at 56.

*The end of Racz's time at Mayo.*  After receiving the letter, Racz took leave from June until November 2019.  ECF No. 127-1 at 10.  On July 13, 2019, Degnim drafted a letter of reference for Racz and sent it to Guidinger for review.  ECF No. 153-11 at 7; ECF No. 153-16 at 8.  Guidinger changed the reference letter, striking language stating that Racz's case load had increased steadily.  ECF No. 153-16 at 10.  Racz's appointment at Mayo ended on December 31, 2019.  ECF No. 128-5 at 2.

## II

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" only if its resolution might affect the outcome

of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Id.* at 255.

In her Amended Complaint, Racz asserts nine claims. Racz and Mayo stipulated to the dismissal of Counts 8 and 9. ECF No. 136. Racz also stated in her opposition brief that "she does not oppose entry of summary judgment on Counts 2, 4, or 5 of her amended complaint." ECF No. 149 at 1 n.1. Accordingly, four of Racz's claims remain in dispute and the subject of Mayo's summary-judgment motion: FMLA discrimination and retaliation (Count 1), Title VII retaliation (Count 3), MHRA reprisal (Count 6), and MPLA retaliation (Count 7). Am. Compl. [ECF No. 39] ¶¶ 62–68, 76–81, 98–110.

A

Racz claims that Mayo engaged in discrimination prohibited by the FMLA when it refused to promote her after she exercised her statutory right to leave. Am. Compl. ¶¶ 62–68. Under the FMLA: "It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). The FMLA entitles an eligible employee to twelve workweeks of leave during a twelve-month period "[b]ecause of the birth of a son or daughter of the employee and in order to care for such son or daughter." 29 U.S.C. § 2612(a)(1)(A). A discrimination claim "arises when an employer takes adverse action against an employee because the employee exercises rights to which [she] is entitled under

18

the FMLA." *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1006 (8th Cir. 2012)*.* "An employee making this type of claim must prove that the employer was motivated by the employee's exercise of rights under the FMLA." *Id.*; *see also Massey-Diez v. Univ. of Iowa Cmty. Med. Servs., Inc.*, 826 F.3d 1149, 1157–58 n.5 (8th Cir. 2016) (noting "unresolved difference of opinion" in the Eighth Circuit as to whether a discrimination claim arises under § 2615(a)(1) or (a)(2)). "[E]mployers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, *promotions* or disciplinary actions." 29 CFR § 825.220(c) (emphasis added).

To establish an FMLA discrimination claim, Racz must show that Mayo refused to promote her, thereby terminating her employment, because she exercised her FMLA rights by taking maternity leave. *See Brown v. City of Jacksonville*, 711 F.3d 883, 891 (8th Cir. 2013). Racz may establish this with either direct evidence or under the *McDonnell Douglas* burden shifting framework. *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004). "A plaintiff with strong (direct) evidence that illegal discrimination motivated the employer's adverse action does not need the three-part *McDonnell Douglas* analysis to get to the jury." *Id.*

The appropriate starting point is direct evidence. "Direct evidence is evidence of conduct or statements by persons involved in the decisionmaking process that is sufficient for a factfinder to find that a discriminatory attitude was more likely than not a motivating factor in the employer's decision." *Kerns v. Capital Graphics, Inc.*, 178 F.3d 1011, 1017 (8th Cir. 1999).

> Direct evidence in this context is not the converse of circumstantial evidence, as many seem to assume. Rather, direct evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action. Thus, "direct" refers to the causal strength of the proof, not whether it is "circumstantial" evidence.

*Griffith*, 387 F.3d at 736 (quoting *Thomas v. First Nat'l Bank of Wynne,* 111 F.3d 64, 66 (8th Cir. 1997)).   A court must examine (1) the speakers of the statements, (2) the context in which the statements were made, and (3) any causal link between an alleged statement and the adverse employment decision.   *Wensel v. State Farm Mut. Auto Ins. Co.*, 218 F. Supp. 2d 1047, 1059 (N.D. Iowa 2002).   Consideration of these factors here shows that the statements on which Racz relies, to the effect that taking her full leave would be detrimental to her chances of a promotion, are direct evidence.

The speakers of the statements were Dr. Amy Degnim and Dr. Judy Boughey. "[T]he speaker or actor need not be *the* decisionmaker; this first step in the direct evidence analysis requires only that the speaker be '*involved* in the decision making process.'" *Id.* (emphasis in original) (quoting *Kerns*, 178 F.3d at 1017).   Both doctors were mentors of Racz and were in the breast/melanoma section.[2]   Degnim was the head of the breast/melanoma section.   ECF No. 153-12 at 4.   Boughey was Racz's research mentor and

---

[2]      The parties dispute whether Degnim and Boughey held supervisory positions over Racz.   *Compare* ECF No. 116 at 11, *with* ECF No. 149 at 14 n.15.   This factor is immaterial here, as the focus of the direct evidence inquiry is on whether the two doctors were involved in the decision-making process.   *Kerns*, 178 F.3d at 1017–18.   As described by the parties, supervisor status does not appear to clarify or resolve the parties' dispute about the level of decision-making authority section and division members held under Mayo's formal promotion process.

was also a member of the section. *Id.* at 4–5.  Both doctors took part in the decision-making process per the Surgery Department's policy, which provided that they, as division members, would be met with "to discuss and reach consensus to support the" promotion decision.  ECF No. 152-1 at 1.  Not only were they explicitly prescribed a role in the decision-making process, but as members of Racz's section, they both participated in the section meeting where Racz's promotion was considered, and the section members voiced their opinions.  ECF No. 118 at 3; ECF No. 124 at 11–12.  Both Degnim and Boughey supported the adverse employment action at issue here—Racz's non-promotion.  ECF No. 153-11 at 10; ECF No. 117 at 3; ECF No. 128-7 at 3.

Mayo argues that Degnim and Boughey should be classified as non-decisionmakers with respect to the promotion decision because the ultimate decision was made by Jakub and Nelson.  ECF No. 156 at 4.  Mayo relies on *Quick v. Wal-Mart Stores, Inc.*, in which the plaintiff, a Wal-Mart photo lab manager, was terminated shortly after taking maternity leave.  441 F.3d 606, 608 (8th Cir. 2016).  As photo lab manager, she reported directly to the Wal-Mart district manager, rather than the store manager.  *Id.*  The district manager and store manager told the plaintiff that "it was not 'good management sense' to take twelve weeks of maternity leave."  *Id.*  The plaintiff nevertheless took leave.  *Id.*  While she was on leave, the district manager was notified that the plaintiff had been violating company policy by offering a two-for-one discount to certain customers.  *Id.* at 609.  On the day the plaintiff returned from maternity leave, the regional personnel manager, who had to approve termination of management employees, directed the district manager to fire the plaintiff.  *Id.*  Later that day, the store manager terminated the plaintiff.  *Id.*  The plaintiff

filed suit, arguing that the criticism she received for taking leave constituted direct evidence of discrimination. *Id.*

In holding that the statement was not direct evidence, the Eighth Circuit stated: "Direct evidence of employment discrimination must be distinguished from stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process." *Id.* This is the quote that Mayo relies on. ECF No. 156 at 4. Yet, the Eighth Circuit did not base its decision on anyone's decisionmaker status in *Quick*. Rather, the court held that the statements about what made "good management sense" were unrelated to the decisional process because they were made in the context of a broader management meeting, and because the statements were made five months before she was terminated. *Quick*, 441 F.3d at 609. Mayo offers no other explanation about why Degnim and Boughey, who have input on promotion decisions within the BEMGI division per Mayo policy, and themselves provided input on Racz's promotion as section-members, should not be considered decisionmakers here. Both doctors contributed to the decision-making process and are thus decisionmakers for purposes of the direct evidence analysis.

The second factor—the context in which the statements were made—further indicates that the statements are direct evidence. Racz separately approached two of her mentors, each of whom had input on whether she should be promoted, notified them of her intention to take a full twelve weeks of maternity leave, and was warned by each of them independently against doing so. Unlike in *Quick*, where the statements were about whether taking maternity leave made "good management sense" and were made in the context of a broader management meeting, with no pending employment decision on the horizon, 441

22

F.3d at 609, the statements here were made by individuals who would have a direct say in Racz's forthcoming promotion decision.

Mayo argues that, because the statements referred to how others in the section would discriminate against Racz if she took a full twelve weeks of leave, the statements are not direct evidence of discrimination. Specifically, Mayo notes that Degnim told Racz she should not take twelve weeks of FMLA leave because it may upset two of her colleagues. ECF No. 156 at 5 (citing ECF No. 128-1 at 4; *Hutton v. Maynard,* 812 F.3d 679, 683–84 (8th Cir. 2015)). As a factual matter, while it's true that Boughey's statements appear limited to how others may react to Racz taking leave, *see* ECF No. 153-12 at 8, this argument ignores the first portion of Racz's deposition testimony about Degnim's statements. There, Racz testified: "[S]he told me that it would be detrimental to me to take 12 weeks of my maternity leave given my upcoming promotion, *and also* that it may upset two of my colleagues." ECF No. 128-1 at 4 (emphasis added).

As a legal matter, if Degnim's statements were limited in scope to the discriminatory animus that one of the other four doctors in the section held towards individuals who take a full twelve weeks of maternity leave, Mayo's argument identifies a distinction that makes no difference. The Eighth Circuit has held that the causal strength of the proof, not its circumstantial nature, determines whether evidence is direct. *Griffith*, 387 F.3d at 736. That Degnim and Boughey's statements referred to the discriminatory animus of others in the five-doctor group in no way undercuts the statements' capacity to demonstrate that persons involved in the decision-making process held a discriminatory attitude which was more likely than not a motivating factor in Mayo's decision not to promote Racz.

Third, and finally, the statements' content demonstrates a causal link between Racz's maternity leave and Mayo's decision not to promote her.  Racz must show "'a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the adverse employment action."  *Id.*  Degnim and Boughey explicitly warned Racz that if she took twelve weeks of maternity leave it could negatively impact her promotion.

The statements here provide a materially greater and more specific link than those in *Griffith v. City of Des Moines*, in which the Eighth Circuit found that a plaintiff had failed to produce direct evidence that racial discrimination motivated an adverse employment action against him.  387 F.3d at 736.  Although he had presented co-worker testimony that his supervisor had made insensitive remarks about African American and female employees on other occasions, the plaintiff failed to present evidence that any decisionmaker ever made a single negative remark about his own Hispanic background. *Id.*  "Thus, the requisite causal link between remarks reflecting racial or gender bias and actions taken against [the plaintiff] [was] lacking."  *Id.*  That is not what we have here. Unlike in *Griffith*, the statements here directly addressed both the cause—discriminatory animus towards the taking of twelve weeks of maternity leave—and the corresponding effect of non-promotion.

Mayo argues that Racz has failed to demonstrate the required link between the statements and her non-promotion because "[t]he non-promotion decision was made 8–10 months after Drs. Degnim and Boughey made their alleged statements."  ECF No. 156 at

6.  Mayo relies on *Corkrean v. Drake University* for its argument that this period effectively eliminates any causal link.  ECF No. 156 at 5–6 (citing *Corkrean v. Drake Univ.*, 55 F.4th 623, 632 (8th Cir. 2022)).  But direct evidence was not at issue in *Corkrean*.  *Corkrean*, 55 F.4th at 630 ("Below, the district court held that Corkrean had no direct evidence of discrimination, and she does not challenge that holding on appeal.").  Rather, *Corkrean* dealt with indirect evidence, as a plaintiff attempted to prove pretext through temporal proximity in a situation that involved "a tenuous temporal connection between [the plaintiff's] harassment complaints and negative performance reviews" and a one-month temporal connection between her filing a complaint with the National Labor Relations Board and her termination.  *Id.* at 632.  The establishment of direct evidence renders discussion of pretext under the *McDonnell Douglas* framework unnecessary for Racz's claim to survive summary judgment.  *See Griffith*, 387 F.3d at 736.

The other case Mayo relies on, *Bone v. G4S Youth Services, LLC*, involved a stray remark a coworker made in front of a plaintiff-employee's superiors six months before her termination.  686 F.3d 948, 953 (8th Cir. 2012).  While the Eighth Circuit engaged in a direct evidence analysis there, *Bone* is distinguishable because the court did not primarily base its decision on the gap in time between proffered evidence of discriminatory motive and the adverse employment action.  *See id.* at 954.  The court first found that the plaintiff's supervisors "merely failed to respond when a representative of their facility's sole client made inappropriate 'stray remarks in the workplace' that were 'unrelated to the decisional process' of terminating Bone's employment."  *Id.* (quoting *Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 449 (8th Cir. 1993)).  Only then did it note that the gap in time *along*

*with* the lack of connection between the comments and her discharge negated the plaintiff's direct evidence argument. *Id.* On this summary-judgment record, a gap in time cannot overcome the strength of the link between the statements and the decision not to promote Racz.

Mayo's argument also implicates practical concerns. The nature of maternity leave often will involve a time delay before the effects of discriminatory animus can be known. Racz notified Degnim that she was pregnant in July 2018.[3] ECF No. 153-12 at 7. Degnim made the statements at issue in that same conversation. *Id.* This was the start of Racz's process of notifying her colleagues within the breast/melanoma section that she was pregnant and giving them advance notice that she would be taking maternity leave. Not only is advance notice an expectation in most professional work environments, but 30 days' notice is a minimum requirement under the statute. 29 U.S.C. § 2612(e)(1). At Degnim's suggestion, Racz announced she was pregnant in mid-to-late-July 2018 at a section meeting. ECF No. 153-12 at 6. Racz did not deliver her baby until January 21, 2019. ECF No. 127-1 at 10. The period between her notifying Degnim in July 2018 and giving birth in January 2019 accounts for roughly six months of delay. She then took the maternity leave at issue until April 25, 2019, adding another three months of delay. It is unknown precisely when the decision was made not to promote her, other than that it was before Nelson's retirement on June 15, 2019. At most, there is a roughly eleven-month time gap between Degnim's statements in July 2018, and Nelson's retirement in June 2019.

---

[3]     It is not stated precisely when Racz spoke with Boughey. *See* ECF No. 153-12 at 8.

Roughly nine months of this maximum eleven-month gap occurred as a natural consequence of the type of discriminatory conduct that is alleged. And Mayo's own briefing suggests that this gap is even shorter. ECF No. 156 at 5–6 ("The non-promotion decision was made 8–10 months after Drs. Degnim and Boughey made their alleged statements."). If Mayo's reasoning were adopted, no discriminatory statements made by an employer when notified of an employee's plan to take maternity leave could be used as direct evidence of discriminatory animus motivating an adverse action occurring upon that employee's return from leave.

Mayo also argues that Racz's poor performance during the intervening period "breaks any link between the alleged statements and the non-promotion decision." *Id.* at 6 (citing *Corkrean*, 55 F.4th at 632). It places particular emphasis on an incident where after her return from leave, and shortly before Mayo notified her that she would not be promoted, Racz left a surgical clip inside a patient during a surgery. ECF No. 127-1 at 18; ECF No. 119-1 at 2; *see also* ECF No. 156 at 12 ("Her performance problems span from 2017 to April 2019, ***when she left a surgical clip in a patient.***") (emphasis in original). While performance deficiencies in the period between protected action and an adverse employment action can detract from a finding that there is a causal link between the two, *see Corkrean*, 55 F.4th at 632, the surgical clip incident was not a factor in Racz's non-promotion. Jakub himself stated that he was aware of other surgeons losing track of a clip during surgery, it had happened to him as well, and when deciding not to promote Racz, the incident "in isolation was not an issue." ECF No. 162-1 at 1.

Because there is direct evidence that Mayo refused to promote Racz due to her exercise of her FMLA rights, the *McDonnell Douglas* framework need not be applied to this issue. *See Griffith*, 387 F.3d at 736. Accordingly, summary judgment is not warranted on Racz's FMLA discrimination claim.

B

Racz also alleges that Mayo engaged in retaliation in violation of the FMLA and Title VII (Counts 1 and 3), and reprisal in violation of the MHRA (Count 6), when it decided not to promote her because she reported and opposed Mayo's unlawful disparate treatment of her based upon her status as a pregnant woman and her taking of FMLA leave. Am. Compl. ¶¶ 62–68, 76–81, 98–104.

The FMLA's antiretaliation provision provides that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). "[F]or example, if an employee complains about an employer's refusal to comply with the statutory mandate to permit FMLA leave—then the employer may not for that reason take adverse action against the employee who is engaged in the opposition." *Pulczinski*, 691 F.3d at 1006. FMLA retaliation claims are "analogous" to Title VII retaliation claims. *Id.* at 1005. "Title VII contains an antiretaliation provision that prohibits an employer from discriminating against an employee because the employee opposed a practice made unlawful by Title VII." *Schottel v. Nebraska State Coll. Sys.*, 42 F.4th 976, 983 (8th Cir. 2022); 42 U.S.C. § 2000e-3(a). Similarly, "[t]he MHRA forbids employers from retaliating when an employee opposes a practice forbidden by the MHRA." *Naguib v. Trimark Hotel*

28

*Corp.*, 903 F.3d 806, 811 (8th Cir. 2018); Minn. Stat. § 363A.15.  The MHRA prohibits discrimination against "women affected by pregnancy, childbirth, or disabilities related to pregnancy or childbirth."  Minn. Stat. § 363.08 subdiv. 5.  "Although the MHRA uses the term 'reprisal' rather than 'retaliation,' MHRA claims are analyzed in the same fashion as claims under Title VII."  *Guimaraes v. SuperValu, Inc.*, File No. 10-cv-366 (RHK/JSM), 2010 WL 5099648 (D. Minn. Dec. 8, 2010), *aff'd*, 674 F.3d 962 (8th Cir. 2012).[4]

Racz offers indirect evidence to support her retaliation claims.  Thus, to establish that Mayo violated the FMLA, Title VII, and the MHRA, Racz must satisfy the *McDonnell Douglas* burden shifting framework.  *Brown v. Diversified Distrib. Sys., LLC*, 801 F.3d 901, 909 (8th Cir. 2015) (applying the *McDonnell Douglas* framework to an FMLA retaliation claim); *Schottel*, 42 F.4th at 983 (applying the *McDonnell Douglas* framework to a Title VII retaliation claim); *McLain v. Andersen Corp.*, 567 F.3d 956, 969 (8th Cir. 2009) (applying the *McDonnell Douglas* framework to an MHRA reprisal claim).  There are three steps to this framework.  First, "[t]o establish a prima facie case of retaliation, an employee-plaintiff must show that '(1) she engaged in protected conduct, (2) she suffered a materially adverse employment act, and (3) the adverse act was causally linked to the protected conduct.'"  *Muldrow v. City of St. Louis*, 30 F.4th 680, 690–91 (8th Cir. 2022) (citation omitted). Second, "[i]f the employee establishes a prima facie case, 'the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for its

---

[4]     As these claims will be assessed together and under the same standard, Racz's retaliation and reprisal claims will generally be referred to as "retaliation claims."

action.'"  *Id.*  Third, "[i]f the employer satisfies its burden, 'the burden then shifts back to the employee to put forth evidence of pretext.'"  *Id.*

The burden of showing a prima facie case is "minimal." *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 881 (8th Cir. 2005).  Here, there is no dispute that Racz engaged in a protected activity when she made her April 2019 report to Guidinger.  There is also no dispute that she suffered an adverse employment action when she was not promoted to Consultant in June.  The issue is whether Racz has identified evidence from which a reasonable juror could infer a causal connection between her report and Mayo's decision not to promote her.  "A plaintiff can establish a causal connection between statutorily protected activity and an adverse employment action through circumstantial evidence, such as the timing between the two events." *Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 761 (8th Cir. 2004) (citation omitted).  "Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc) (citation omitted).  Temporal proximity alone may suffice only if it is "very close." *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 866 (8th Cir. 2006) (citation omitted).  In the FMLA context, without something more, a gap of more than two months between the relevant event and an adverse action is generally considered to be "too long" to show a causal connection between the two. *Sisk v. Picture People, Inc.*, 669 F.3d 896, 901 (8th Cir. 2012).

Here, Racz has satisfied this minimal burden by demonstrating that a reasonable juror could infer a causal connection between (1) her April 2019 report to Guidinger, (2)

Guidinger's subsequent notice to Jakub of Racz's report in early May 2019, and (3) Jakub's decision not to promote Racz, which occurred at some point on or before June 15, 2019. While there is a roughly month-and-a-half gap between Racz's April 26, 2019, complaint, and the last possible date of the non-promotion decision—Nelson's retirement on June 15, 2019—there is no reason to draw an inference in favor of Mayo, the movant here, that the decision was made on the last possible date. Jakub has refused to state when he made the ultimate decision not to promote Racz—meaning although the last possible date the decision could have been made was June 15, 2019, it could have been made well before then, including the day Jakub was notified of Racz's complaint to Guidinger.

The burden thus shifts to Mayo to articulate a legitimate, non-retaliatory reason for its action. It has done so. Mayo's articulated reason for not promoting Racz is her failure to develop an oncoplastic practice, her remaining need for technical mentoring to complete procedures, her low clinical operative volumes, the lack of complexity in her cases, and her professionalism issues. *See* ECF No. 128-5; ECF No. 116 at 31. Along with providing the letter it sent Racz notifying her of the reasons underlying her non-promotion, Mayo has supported its non-promotion decision with Racz's annual reviews, email communications with Racz articulating her subpar performance, examples of Racz's unprofessional conduct, and statistics demonstrating Racz's operative volumes and case types. There really isn't any question that these are legitimate, non-retaliatory reasons that would have justified Mayo's decision not to promote Racz.

So, the burden shifts back to Racz to put forth evidence of pretext. To demonstrate pretext, Racz must either (1) show Mayo's proffered explanation is "unworthy of credence"

by rebutting its underlying factual claims, or (2) show that a prohibited reason more likely motivated Mayo by rebutting Mayo's decision not to promote her. *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1052 (8th Cir. 2006). Racz takes the latter approach, seeking to demonstrate pretext by showing that a prohibited reason more likely motivated Mayo's decision.

At this stage, Racz has done enough to show that Mayo's justifications are pretextual—or, more correctly, that a reasonable juror could conclude they are. A plaintiff may rely on temporal proximity to show pretext. *See Bainbridge*, 378 F.3d at 760–61; *Hillins v. Mktg. Architects, Inc.*, 808 F. Supp. 2d 1145, 1155 (D. Minn. 2011). Racz offers more, supplementing temporal proximity with record evidence describing the broader context in which the adverse decision was made. "[W]here an employer has known about its stated reason for taking adverse action against an employee 'for an extended period of time,' but only acts after the employee engages in protected activity, the employer's earlier inaction supports an inference of pretext." *Brown*, 801 F.3d at 910. The early inaction of Mayo with regard to Racz's poor performance makes sense given Racz's three-year appointment timeline. What is problematic, however, is the sequence of events spanning her return from leave to her notification of non-promotion. Upon her return from leave, Jakub indicated to Racz that she would have additional time to prove herself as a Senior Associate Consultant; the implication being that she would have additional time before a promotion decision was made. Specifically, Jakub told Racz that her appointment would be extended by four to five months to account for her absence on medical leave, and to "give her the absolute benefit of the doubt and give her as many opportunities as she could

32

to prove herself" and "have the highest chance to be successful." ECF No. 153-9 at 8. In other words, Jakub indicated to Racz that Mayo would continue its course of inaction for four to five months. As evidenced by Mayo's detailed documentation of Racz's performance throughout her appointment, when he made this statement, Jakub knew about the facts he would eventually articulate as the basis for her non-promotion. The parties have identified only two events which occurred thereafter that could account for a sudden acceleration in Mayo's promotion decision timeline. The first possible explanation is the May 2019 incident where Racz left a surgical clip inside of a patient. ECF No. 127-1 at 18; ECF No. 119-1 at 2. Yet Jakub himself noted that the incident "in isolation was not an issue." ECF No. 162-1 at 1. A reasonable juror could find that the more likely explanation is that days after he told her she would be given additional time to prove herself, Jakub was notified that Racz had filed a complaint with Guidinger. *See* ECF No. 152-2 at 3. While Mayo complied with the timeline set forth in the Department of Surgery's promotion policy by notifying Racz of her non-promotion "[p]rior to 36 months," *see* ECF No. 127-1 at 21, Jakub's about-face with regard to Racz's added time to prove herself bolsters an inference of pretext. This also distinguishes this case from *Corkrean*. Although the plaintiff-employee there also had a history of poor performance, there was no evidence that just before the protected conduct the employer committed to allowing the employee additional time to improve performance, then afterwards reneged. *Cf. Corkrean*, 55 F.4th at 632.[5]

---

[5]     Mayo argues that Racz's April 2019 complaint relates back to her Fall 2018 complaint to Guidinger, thus greatly expanding the temporal gap between her protected conduct and the adverse action. ECF No. 156 at 11–12. But the later complaint contained more allegations than the first, including that the breast surgeons had asked Racz to work

A genuine issue of material fact exists as to whether Mayo's proffered nondiscriminatory reason for Racz's non-promotion was pretext for unlawful retaliation. Therefore, summary judgment for Mayo on the retaliation and reprisal claims is not warranted.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED THAT** Defendant Mayo Clinic's Motion for Summary Judgment [ECF No. 114] is **GRANTED IN PART AND DENIED IN PART** as follows.

1. The Motion for Summary Judgment is **GRANTED** with regard to Counts 2, 4, and 5 of the Amended Complaint [ECF No. 39], as Racz abandoned these claims.

2. The Motion for Summary Judgment is **DENIED** in all other respects.

3. Pursuant to the parties' stipulation [ECF No. 136], Counts 8 and 9 of the Amended Complaint [ECF No. 39] are **DISMISSED** with prejudice.


Date:  February 7, 2023                                    s/ Eric C. Tostrud
                                                           Eric C. Tostrud
                                                           United States District Court

---

beyond the work restrictions that Trinidad had imposed in 2018, and that Trinidad had contacted Jakub about this directly.  *See* ECF No. 153-5 at 3.  These additional allegations leave fact disputes about whether the April 2019 complaint relates back to—or is just a repeat of—the Fall 2018 complaint.